J-S19016-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF K.A.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.I.S.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 45 WDA 2026 |

Appeal from the Decree Entered December 3, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
2025-A0116

| | | |
|---|---|---|
| IN THE MATTER OF: THE ADOPTION OF B.G.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.I.S.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 46 WDA 2026 |

Appeal from the Decree Entered December 3, 2025
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
2025-A0117

BEFORE:  SULLIVAN, J., NEUMAN, J., and STEVENS, P.J.E.*

MEMORANDUM BY NEUMAN, J.:                     **FILED: July 28, 2026**

Appellant, K.I.S.M. ("Mother"), appeals from the decrees entered on December 3, 2025, in the Court of Common Pleas of Erie County Orphans' Court, which involuntarily terminated her parental rights to her children,

_____

* Former Justice specially assigned to the Superior Court.

K.A.M. (born August 2021), and B.G.M. (born June 2025) (collectively "Children").[1,2] After careful review, we affirm.

## Background

We glean the following relevant facts and procedural history from the certified record, including the involuntary termination ("IVT") trial testimony of Carrie Bielak, the Erie County Office of Children and Youth ("OCY") caseworker assigned to K.A.M.'s and B.G.M.'s cases. OCY became involved in K.A.M.'s life upon his birth in August 2021. N.T. at 11. At that time, it was reported K.A.M. was born in a car, Mother had not sought medical attention for him, and there were concerns of substance use. *Id.* The family was set up with services to ensure K.A.M.'s safety and the agency's involvement was closed. *Id.*

---

[1] We *sua sponte* consolidated Mother's appeals at Docket Nos. 45 and 46 WDA 2026, as they involve related parties and issues. *See* Pa.R.A.P. 513 (addressing consolidation of multiple appeals).

[2] K.A.M.'s father is P.A.L., III. *See* Petition for Involuntary Termination of Parental Rights ("IVT Petition") at Docket No. 2025-A0116, 10/7/25, at ¶ 4; N.T., 12/2/25, at 4. B.G.M.'s putative father is J.J.F. *See* Petition for Involuntary Termination of Parental Rights ("IVT Petition") at Docket No. 2025-A0117, 10/7/25, at ¶ 5; N.T. at 4. The orphans' court terminated the parental rights of the respective fathers, including any unknown biological father of B.G.M., by decrees entered on December 3, 2025. No appeal was filed by P.A.L., III, J.J.F., or any unknown biological father, and they are not participating parties to the instant appeals.

In June 2024, OCY received a new referral when Mother gave birth to another child, K.F., at home. *Id.* at 11-12.[3] Mother had presented at the hospital where both she and K.F. tested positive for multiple controlled substances. *See* N.T. at 11-12. OCY also had concerns due to an unsafe housing situation, Mother's untreated mental health, reports of domestic violence, a lack of medical care for K.A.M., and Mother's multiple active arrest warrants. *Id.* at 12-14, 47. A Family Engagement Initiative ("FEI") meeting was held on June 13, 2024, where Mother was present. *Id.* at 14-15. At that time, a plan was made for Mother and J.J.F. to participate in services which would alleviate OCY's concerns. *Id.* at 14. In the meantime, private arrangements were made for K.F. to stay with a maternal aunt, while K.A.M. stayed with a family friend. *Id.*[4] Subsequent to the FEI meeting, Mother did not participate in services, did not have any contact with K.A.M., and had no further contact with OCY until her arrest in June 2025. *See id.* at 15. Ms.

---

[3] K.F. is the maternal half-sibling of K.A.M., and is believed to be the full sibling of B.G.M. Orphans' Court Opinion ("OCO"), 3/3/26, at 1 n.3. K.F.'s father is J.J.F. *Id.* Mother ultimately signed a petition voluntarily relinquishing her parental rights to K.F., which was approved by the orphans' court on June 18, 2025. *Id.* The termination of Mother's parental rights to K.F. is not subject to this appeal; thus, our focus here is on the evidence as it pertains to K.A.M. and B.G.M. Further, we note J.J.F.'s parental rights to K.F. were involuntarily terminated on June 18, 2025; he did not appeal that decision. *See* N.T. at 29.

[4] K.A.M.'s father, P.A.L., III, was incarcerated at the time of the FEI meeting. N.T. at 13.

Bielak testified that it was believed Mother was residing with J.J.F., however, he denied they were a couple or that she was living with him. *Id.* at 15, 19.

On October 9, 2024, OCY obtained an emergency protective order for K.A.M. and K.F. after receiving a referral that K.A.M.'s caregiver was using an illegal substance. *Id.* at 15-16; *see also* OCY Exhibit #9 (Order for Verbal Authorization, 10/11/24, at 1-2). A shelter care hearing was held on October 11, 2024, which Mother did not attend, and it was determined there was sufficient evidence to support temporary care. N.T. at 16; *see also* OCY Exhibit #9 (Shelter Care Order, 10/15/24, at 1-2). On October 14, 2024, OCY filed a dependency petition and motion for aggravated circumstances against Mother. *See generally*, OCY Exhibit #7.[5] An adjudicatory hearing, which Mother did not attend, was held on October 22, 2024. N.T. at 17; OCY Exhibit #9 (Recommendation for Adjudication and Disposition, 10/29/24, at 1). By order dated October 25, 2024, and entered October 29, 2024, K.A.M. was adjudicated dependent and was placed in kinship care. *See* OCY Exhibit #9 (Recommendation for Adjudication and Disposition, 10/29/24, at 1, 5). A dispositional hearing occurred immediately following the adjudication hearing and although the hearing officer found aggravated circumstances existed, OCY set forth recommendations for Mother which were accepted by the hearing

---

[5] Mother's parental rights were previously involuntarily terminated as to two other children in 2017 based on unstable housing, substance use, untreated mental health, and inadequate basic needs. N.T. at 10; *see also* OCY Exhibit #7 (Erie County Termination Decrees).

officer and juvenile court. ***See id.*** at 3. The juvenile court ordered Mother to, *inter alia*, handle her outstanding warrants, refrain from drug use and submit to drug testing, fill out an application for Family Dependency Treatment Court, obtain and maintain employment and stable housing, participate in a parenting education program, attend all appointments for K.A.M., and maintain contact with OCY. ***See id.*** K.A.M.'s permanency goal was for reunification concurrent with adoption. ***See id.*** at 2.

On November 6, 2024, K.A.M. was removed from kinship placement and placed into a foster home. OCY Exhibit #9 (Order, 11/6/24, at unpaginated 1). The first permanency review hearing for K.A.M. was held on January 22, 2025. N.T. at 18; OCY Exhibit #9 (Permanency Review Order, 1/28/25, at 1). According to Ms. Bielak, Mother did not attend the hearing, had not responded to attempts to contact her, had not complied with any of the goals set for her, and had not had any contact with K.A.M. N.T. at 18-19; OCY Exhibit #9 (Permanency Review Order, 1/28/25, at 1). Nevertheless, the juvenile court continued to set reunification goals for Mother. OCY Exhibit #9 (Permanency Review Order, 1/28/25, at 3).

A second permanency review hearing was held on April 21, 2025. N.T. at 19-20; OCY Exhibit #9 (Permanency Review Order, 4/25/25, at 1). Ms. Bielak testified she had received one text from Mother during that review period, but after she responded, she had no further communication with Mother. ***See*** N.T. at 20. Ms. Bielak met with J.J.F. in his home during the review period, and while it was reported that Mother had been present in the

house, she did not join their meeting. *Id.* at 20-21. In all other respects, there had been no change since Mother again failed to appear for the hearing, did not progress in her goals, and had no contact with K.A.M. during the review period. *Id.* at 20. Therefore, the juvenile court ordered that no further services should be ordered for Mother; however, K.A.M.'s permanency goal remained reunification concurrent with adoption to allow P.A.L., III the chance to participate in a plan after his recent release from incarceration. *Id.* at 22; *see also* OCY Exhibit #9 (Permanency Review Order, 4/25/25, at 1,3).

On May 13, 2025, Ms. Bielak received a phone call from Hamot Hospital informing her Mother had "jumped out of a second-story window trying to evade the police while she was pregnant…." N.T. at 25-26, 48. It was reported "that she had hurt herself and … there were concerns that she was using substance[s] at that time." *Id.* at 26. Ms. Bielak testified regarding Mother's criminal dockets, including one with an offense date of May 11, 2025, for the charges of aggravated assault of an unborn child and flight to avoid apprehension. *See id.* at 26-27; *see generally*, OCY Exhibit #12 (Mother's Criminal Dockets).[6]

Ms. Bielak stated OCY received a referral on June 10, 2025, because Mother had recently given birth to B.G.M., for whom she had not sought medical attention, and there were concerns of parental substance use. N.T. at 27-28. OCY immediately sought and obtained an emergency protective

_____

[6] 18 Pa.C.S. §§ 2606 and 5126, respectively.

order for B.G.M. and had law enforcement assist with the removal based on safety concerns related to unsafe housing and untreated mental health. *Id.* at 28; OCY Exhibit #10 (Order for Verbal Authorization, 6/11/25, at 1-2); *see generally*, OCY Exhibit #15 (City of Erie Police Report). At that time, Mother was taken into custody on her outstanding warrants. N.T. at 28; OCY Exhibit #8 (Dependency Petition, 6/16/25, at 4); OCY Exhibit #15 (City of Erie Police Report at 3-4). After the removal, B.G.M. was admitted to the hospital for jaundice and an infected umbilical cord. OCY Exhibit #8 (Dependency Petition, 6/16/25, at 3).

On June 12, 2025, a shelter care hearing was held where Mother, who remained incarcerated, stipulated to continued temporary care of B.G.M. *See* OCY Exhibit #10 (Recommendation for Shelter Care, 6/23/25, at 1-2). On June 16, 2025, OCY filed a dependency petition and motion for aggravated circumstances against Mother. *See generally*, OCY Exhibit #8; *see also* note 5 *supra*. At an adjudication hearing held on June 24, 2025, Mother stipulated to the allegations set forth in the dependency petition and B.G.M. was subsequently adjudicated dependent by the juvenile court on June 26, 2025. OCY Exhibit #10 (Recommendation for Adjudication, 6/26/25, at 1-3). The motion for aggravated circumstances was also granted. *See id.*

A third permanency review hearing for K.A.M. and a dispositional hearing for B.G.M. were held on July 14, 2025. N.T. at 30-31; OCY Exhibit #9 (Permanency Review Order, 7/18/25, at 1); OCY Exhibit #10 (Dispositional Order, 7/15/25, at 1). At the hearing, a treatment plan was ordered for

Mother regarding the Children, despite the existence of aggravated circumstances, her incarceration, and her compliance failures over the prior year. N.T. at 31; OCY Exhibit #9 (Permanency Review Order, 7/18/25, at 3); OCY Exhibit #10 (Dispositional Order, 7/15/25, at 3). B.G.M.'s permanency goal was set as reunification concurrent with adoption. OCY Exhibit #10 (Dispositional Order, 7/15/25, at 2).

On October 7, 2025, OCY filed a petition seeking to involuntarily terminate Mother's parental rights to K.A.M. pursuant to Sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. The same day, OCY filed a petition seeking to involuntarily terminate Mother's parental rights to B.G.M. pursuant to Sections 2511(a)(2) and (b) of the Adoption Act. In its petitions, OCY indicated K.A.M. had been in placement for twelve months, while B.G.M. had been in placement for four months, and that there had been no progress in alleviating the circumstances which resulted in the Children's removals. *See* IVT Petition at Docket No. 2025-A0116, 10/7/25, at ¶ i; IVT Petition at Docket No. 2025-A0117, 10/7/25, at ¶ f.

A permanency review hearing was held for the Children on October 22, 2025. N.T. at 36-37. During the review period, Mother remained incarcerated and Ms. Bielak stated that, although Mother reported participating in some classes, no confirmation was ever provided. *Id.* at 37, 51. At the conclusion of the hearing, the juvenile court found Mother had minimally complied with her treatment plan and had made no progress toward alleviating the circumstances that led to the Children's placement. OCY Exhibit #9

(Permanency Review Order, 10/28/25, at 1-2); OCY Exhibit #10 (Permanency Review Order, 10/28/25, at 1-2). The juvenile court ordered the Children's permanency plan goals be changed to adoption. OCY Exhibit #9 (Permanency Review Order, 10/28/25, at 2); OCY Exhibit #10 (Permanency Review Order, 10/28/25, at 2).

An IVT trial was held on December 2, 2025, where OCY presented the testimony of caseworker Ms. Bielak.[7] In addition to the testimony discussed *supra*, Ms. Bielak testified Mother had not been able to demonstrate an ability

---

[7] Pursuant to 23 Pa.C.S. § 2313(a), a child has a right to counsel in a contested IVT trial. Instantly, the orphans' court appointed the Children's guardian *ad litem* ("GAL"), Abigail Groner, Esquire, to represent Children's legal interests in the IVT trial. **See** Order at Docket No. 2025-A0116, 10/10/25, at 1; Order at Docket No. 2025-A0117, 10/14/25, at 1. "[W]here an orphans' court has appointed a GAL/[c]ounsel to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict." **In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020); **see also id.** at 1234 n.20 ("[T]he child's 'legal interests' represented by counsel include the child's preferred outcome, whereas the 'best interests' represented by a GAL reflect what the GAL believes will provide the most beneficial outcome for the child's well-being."). Accordingly, we observe the orphans' court expressly found no conflict of interest in Attorney Groner's serving as both the Children's GAL and legal counsel in this matter based on their age and prior interactions with them. **See** N.T. at 9; OCO at 6 n.5. Our Supreme Court has held, "during contested termination-of-parental rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-[GAL] representing the child's best interests can also represent the child's legal interests." **In re T.S.**, 192 A.3d 1080, 1092 (Pa. 2018). Moreover, if the preferred outcome of a child is incapable of ascertainment because the child is too young to express a preference, "there can be no conflict between the child's legal interests and his or her best interests…." **Id.** Therefore, we conclude the Children were afforded their statutorily-mandated right to counsel.

to safely parent the Children, and the conditions and circumstances that led to removal continue to exist. N.T. at 43. Ms. Bielak further testified the Children are placed together in a pre-adoptive foster home which meets all of their needs and they are bonded to their foster parents. *Id.* at 44-46. She added that K.A.M. has not seen Mother since June 11, 2024, and B.G.M. has not seen Mother since June 10, 2025. *Id.* at 44, 46. Therefore, Ms. Bielak opined the Children's best interests would be served by finding permanency with their foster parents and stated they would suffer no detriment by Mother's parental rights being terminated. *Id.* at 45-46. On cross-examination, Ms. Bielak acknowledged that since being incarcerated, Mother had been in contact regarding how the Children were doing. *Id.* at 51-52.

Mother then testified on her own behalf. When questioned by her counsel regarding her incarceration in Erie County Prison (she had previously been incarcerated in Crawford County at the October 2025 permanency review), Mother stated, "It was a big misunderstanding. I just got transferred back to go to a court hearing, which I am taking to trial. I am getting bailed out today[,] so." *Id.* at 58-59. Mother testified that upon release, she planned to live with a friend who would provide "a stable environment for [her]." *Id.* at 59. According to Mother, it was still her plan to participate in drug and alcohol treatment upon release; however, she stated she no longer felt she needed inpatient treatment, in contrast to what she had stated at the October permanency review hearing. *Id.* at 59-60, 64. Mother admitted to her prior drug use and stated the last time she used was in May after she

- 10 -

jumped out of the window. *Id.* at 61. Mother acknowledged she has mental health issues, including bipolar depression for which she was taking medication; however, she had no concrete plans set up to address her mental health upon release from prison. *Id.* at 63, 65. Regarding her efforts while incarcerated, Mother stated she went to parenting, drug and alcohol, anger management, and mental health classes. *Id.* at 60. Mother explained that while she was in Erie County Prison, she was able to contact OCY through a kiosk; however, that option was not available to her while in Crawford County Prison, nor did she have the address to write to the agency. *Id.*

When asked why she feels her parental rights should not be terminated, Mother stated:

> Because I'm a good mother. Besides the fact that I was on drugs and I was out of my mind for a period of time, I did take care of [K.A.M.] I made sure all his needs were met. He had a roof over his head. We did have checkups with [a doctor]. He ate and he had my full undivided attention.

*Id.* at 61. When given the opportunity to tell the orphans' court anything else she had to say, Mother testified:

> I made the biggest mistake by steering away and allowing substances to take over my mind. I was out of my mind. … I literally jumped out of a second-story window, not … because of the police. It was because I was hearing voices. I was like pounding on a door and … I don't know. I just jumped out of a window. I went to the trauma unit at Hamot. They took the phone cords from me and put me on suicide watch, but they still released me knowing that my mental health was messed up.
>
> I did evade Ms. Bielak for that period of time because I … wasn't there. I was not me. I was selfish, not thinking of my children. But now that I'm clean — I know you guys say this, that I'm in jail now, she can do this, she can do that. I'm clean. … [M]y kids are

- 11 -

all I have.  … I never realized it before, but … I'm willing to do anything and everything I have to do for my kids.  I know I'm late, and I may be late.  I'm just hoping I'm not too late.  I just hope I'm able to get a chance.  I'm hoping and praying.  That's it.

*Id.* at 62-63.  When questioned by the Children's GAL/legal counsel, Mother admitted she did not complete any programs or have contact with OCY prior to her incarceration despite having agreed to do so in June 2024.  *Id.* at 65-66.

Following the parties' presentation of witness testimony, the Children's GAL/legal counsel advocated for the termination of Mother's parental rights. *See id.* at 74-76.  The Children's GAL/legal counsel argued:

[I]f [Mother] hadn't been picked up on the warrant, I don't know if we ever would have heard from her.  She might have never seen [K.A.M.] again because, as she testified, she did not reach out to communicate with OCY until she was incarcerated.  … [S]he has consistently shown the inability to parent and make important decisions for these children[,] putting them both at risk multiple times.

I understand now that she's sober while incarcerated, but once she's out[] we don't know if she is able to be successful since prior to incarceration, she was not.  And if she had maybe turned herself in earlier, we might have been able to work a program with her[,] and she might have been able to successfully reunify.  At this point the [C]hildren have waited a long time.  [K.A.M.] needs consistency.  [B.G.M.] is just starting in her life.  She needs to have stability and consistency.

***

With not being able to even at this point know whether we're going to be able to have any stability with any of these parents, I don't believe it's fair for [K.A.M.] and [B.G.M.] to continuously wait for parents who have actively shown their own selfish[ness, putting themselves] before their kids at every given step of this way.  I believe it is in the [Children's] best interests to have [the parents'] rights terminated, and I believe that where they are now is in a stable and loving home that will be able to continue consistency

and show them basically how parents are supposed to take care of their children. So[,] at this time[,] I would ask for the rights to be terminated.

*Id.* at 74-76.

At the close of the hearing, the orphans' court issued its ruling from the bench, involuntarily terminating Mother's parental rights to K.A.M. pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b), and to B.G.M. pursuant to 23 Pa.C.S. §§ 2511(a)(2) and (b). **See id.** at 81-82; **see also** Decree as to K.I.S.M. at Docket No. 2025-A0116, 12/2/25, at 1-2 (unpaginated); Decree as to K.I.S.M. at Docket No. 2025-A0117, 12/2/25, at 1 (single page). On January 2, 2026, Mother filed a timely notice of appeal,[8] along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). In response, the orphans' court filed its Rule 1925(a) opinion on March 3, 2026.

**Issues**

On appeal, Mother presents the following issues for our review:

1. Whether the [orphans' c]ourt committed an abuse of discretion and/or error of law when it concluded that the agency established, by clear and convincing evidence, the grounds for

---

[8] The decrees terminating Mother's parental rights are dated and were filed on December 2, 2025; however, the docket indicates notice of the decrees was provided on December 3, 2025, pursuant to Pa.R.Civ.P. 236. **See** Pa.R.A.P. 108(b) ("The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the date on which the clerk makes the notation in the docket that written notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b)."); **see also** Pa.R.A.P. 903(a) (stating that "the notice of appeal … shall be filed within 30 days after the **entry of the order** from which the appeal is taken") (emphasis added).

- 13 -

involuntary termination of [Mother's] parental rights … under 23 Pa[.]C.S.[] § 2511(a)[(1)] and (a)(2)?

2. Whether the [orphans' c]ourt committed an abuse of discretion and/or error of law when it concluded that the agency established, by clear and convincing evidence, the grounds for involuntary termination of [Mother's] parental rights … under 23 Pa[.]C.S.[] § 2511(b)?

3. Whether the [orphans' c]ourt committed an abuse of discretion and/or error of law when it concluded that the agency established, by clear and convincing evidence, the grounds for involuntary termination of [Mother's] parental rights … under 23 Pa[.]C.S.[] § 2511(a)(5)?

4. Whether the [orphans' c]ourt committed an abuse of discretion and/or error of law when it concluded that the agency established, by clear and convincing evidence, the grounds for involuntary termination of [Mother's] parental rights … under 23 Pa[.]C.S.[] § 2511(a)(8) … and … (b)?

Mother's Brief at viii (unnecessary capitalization omitted).[9]

**Analysis**

Our standard of review is well-established:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa.

---

[9] While Mother presents four issues in her statement of questions involved, she provides just one heading in her argument section. ***See*** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part — in distinctive type or in type distinctively displayed — the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."). Despite this organizational defect, we proceed with the merits of Mother's appeal as we are able to discern the issues raised on appeal which were addressed by the orphans' court in its Rule 1925(a) opinion. ***See*** Pa.R.A.P. 2101 (stating, "Briefs … shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed….").

2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, 9 A.3d [1179,] 1190[ (Pa. 2010)].

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re Q.R.D.***, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

Section 2511 of the Adoption Act governs the termination of parental rights and requires a bifurcated analysis. ***See In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Id.*** (cleaned up). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order

terminating parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

*Section 2511(a)(2)*

We consider the involuntary termination of Mother's rights under Section 2511(a)(2). Section 2511(a)(2) provides a basis for termination when:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

> This Court has observed:

> To satisfy the requirements of Section 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties.

*In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (cleaned up).

Instantly, Mother claims the orphans' court erred in terminating her parental rights under Section 2511(a)(2) because OCY "failed to present to the [orphans'] court clear and convincing evidence that she could not or refused to remedy the issues that caused the … [C]hildren to be without parental care and control[,] as she was not given the opportunity to do so due to her incarceration throughout the life of the case." Mother's Brief at xvi-

xvii.  Mother argues "[her] testimony … indicates that she was attempting compliance with her court-ordered treatment plan and she was attempting to alleviate the concerns that brought [the C]hildren into care to the best of her ability[,]" and that "she attempted to maintain contact with [the C]hildren as best she could while incarcerated." *Id.* at xvii.  Mother fails to convince us any relief is due on this claim.

Here, the orphans' court stated,

Mother's first contact with … [OCY] was in 2016, when her twin children were removed from her care due to unstable housing; substance use; untreated mental health; and inadequate basic needs.  Mother was unable to alleviate the circumstances that led to their removal and her parental rights to those children were involuntarily terminated.

In 2024, nearly seven years after the removal of her twin children, Mother found herself, or rather … [OCY] found Mother in the exact same position she was in in 2016.  K.[]F. was born exposed to a cocktail of controlled substances, illustrating Mother's significant drug use while pregnant and in a primary care position for K.A.M.  An FEI meeting was held, and Mother was given an opportunity to plan for K.A.M. and K.[]F. to be safely cared for while she participated in services to prevent [their] removal.  Instead, Mother placed [K.A.M. and K.F.] with an unsafe caregiver and made no effort to improve her situation, ultimately leading [to] their removal from her care.  Following the removal, Mother had no contact with … [OCY]; did not participate in any services; had no visitation with K.A.M.; and did not show up for any of the dependency proceedings.  In fact, Mother evidenced no interest in parenting K.A.M. prior to her incarceration.

In May of 2025, Mother, while pregnant with B.G.M., jumped out of a second[-]story window to avoid arrest on her outstanding warrants.  [In early June] 2025, B.G.M. was born in the home and did not receive any medical care following her birth until … [OCY] obtained an [emergency protective order] for her on June 10, 2025.  Mother's actions while pregnant with B.G.M. and following

her birth demonstrate her continued inability to safely parent any child in [her] care.

At the time of the IVT trial[,] Mother had been incarcerated for approximately seven … months and was awaiting the resolution of her aggravated assault and flight to avoid apprehension charges. Mother testified at trial that she would be released on bail later that day, yet she still had no plan to address her long-term substance use. In fact, it was Mother's belief that moving in with her friend, who was reportedly stable, would ensure her sobriety. Moreover, while Mother acknowledged her substance use[,] the record reflects that she was still unable, even sober, to recognize the substantial impact that use had on K.A.M. in the first three … years of his life. It was Mother's testimony that K.A.M. was well cared for in her home and his needs were being met. This contention is not only contradicted by the evidence leading to K.A.M.'s adjudication[,] but also defies reason and logic given the number of substances K.[]F. was positive for at his birth, while three … year old K.A.M. was in Mother's care.

Mother demonstrated a repeated inability to parent K.A.M. for one … year before the IVT petition was filed. From October 2024 through June of 2025, while Mother was out of prison[,] she was unwilling or unable to alleviate the circumstances that led to K.A.M.'s removal. While her incarceration may be a motivation to parent [now], Mother's actions in 2016-2017 and in the present case cause the orphan[]s['] court grave concern about her ability to parent these Children in the future.

OCO at 13-14 (unnecessary capitalization omitted).

The record supports the orphans' court conclusion Section 2511(a)(2) has been met. Regarding the first prong of Section 2511(a)(2), the record shows Mother suffers from a repeated and continued incapacity, neglect, or refusal. Specifically, Mother lacks stable and safe housing, struggles with substance use and mental health issues, and fails to reliably and responsibly care for the Children. *See generally* N.T. at 11-15, 18-20, 25-28, 47-48, 59-61, 63-65.

The second prong of Section 2511(a)(2) is also satisfied. The record demonstrates Mother's incapacity, neglect, or refusal has caused the Children to be without essential parental care, control, or subsistence. K.A.M. was removed from Mother's care by OCY in October 2024. *Id.* at 15-16. However, Mother had not seen K.A.M. since his private placement in June 2024 and made no effort to do so prior to her incarceration in June 2025. *Id.* at 15, 18-20, 44. B.G.M. has been removed from Mother's care since shortly after her birth in June 2025 and has not seen Mother since, due to Mother's incarceration. *Id.* at 27-28, 46. According to Ms. Bielak, K.A.M. was born in a car and B.G.M. was born in Mother's residence and neither received medical treatment while under Mother's care. *Id.* at 11, 14, 27, 47.

Finally, the third prong of Section 2511(a)(2) is fulfilled, as the record establishes the causes of Mother's incapacity, neglect, or refusal cannot or will not be remedied given Mother's limited progress during Children's dependency. We acknowledge Mother has been incarcerated throughout the entirety of B.G.M.'s case, however, her overall lengthy history with OCY establishes that even if she were not incarcerated, the causes of her incapacity, neglect, or refusal nevertheless would not be remedied. Although Mother acknowledged her issues with substance use and mental health at the time of the IVT trial, she made no plans to properly address those issues upon her release from incarceration. As noted by the orphans' court,

> [Mother was], quite frankly, unable to care for [K.A.M.] when …
> given the opportunity to do so. [She was] out in the community
> with the help of [OCY] and under court order and knowing that

[her] … children, [including K.F.,] … were removed from [her] care, and [she] still couldn't find the ability to successfully treat [her] addiction and [her] mental health, despite … [being] given the places to go, [and having] the assessments set up. [She was] unable to do all of those things, and now [she is] incarcerated and [she is] telling me that [she is] able to do all of those things now.

[She] doesn't even have outpatient set up. [She does not] have anything set up for [her] release and [she is] telling me [she is] getting released today. In fact, the last time we were here, [she] told me that [she was] going to go to a friend's house for two weeks and then go to House of Healing. And quite frankly, today that's not even in the plan. If [she] think[s] addiction is just going to be gone when [she] walk[s] out those prison doors, [she is] sorely mistaken and [she has not] learned a darn [*sic*] thing.

*Id.* at 80-81. While Mother reported completing classes while incarcerated, she provided no confirmation to OCY. *Id.* at 51, 60. She further claimed K.A.M. had checkups with a doctor, however, OCY had only been able to confirm he had been seen by medical staff on one occasion and there was no record of a primary care provider. *Id.* at 47, 61. Additionally, Mother made no mention regarding housing that would be appropriate for the Children or how she would provide for them financially.

Based on the foregoing, we observe no abuse of discretion or error of law by the orphans' court in terminating Mother's parental rights to both K.A.M. and B.G.M. pursuant to Section 2511(a)(2). Therefore, we next consider Section 2511(b).

*Section 2511(b)*

Section 2511(b) provides, in relevant part:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be

- 20 -

terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

With respect to Section 2511(b), our Supreme Court has explained:

[C]ourts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

Here, Mother claims the orphans' court erred in its determination that the best interest of the Children would be served by the termination of her parental rights. Mother's Brief at xix. She contends "the environmental factors were out of her control due to her incarceration" and "she testified … she was a good mother and made sure all of K.A.M.'s needs were met while he was in her care." *Id.* at xix-xx. Again, Mother fails to convince us any relief is warranted on this claim.

Notably, Mother fails to explain how the best interest of the Children would not be served by the termination of her parental rights. Instead, she argues only that the orphans' court improperly terminated her parental rights based on environmental factors outside of her control based on her incarceration. Instantly, we observe Mother was not incarcerated until June 2025, over 8 months after K.A.M. was adjudicated dependent and nearly a year after he had entered private placement. *See* N.T. at 17, 28. Further, the termination of her parental rights does not stem solely from environmental factors as claimed by Mother, but rather the litany of actions and/or inactions she undertook, described at length *supra.* As noted by the orphans' court above, Mother's testimony that she was a good mother who met K.A.M.'s needs is belied by the evidence leading to his adjudication, including the number of controlled substances present in K.F.'s (and therefore Mother's) system while she was caring for K.A.M. *See* N.T. at 11-12; OCO at 14.

Regarding the best interests of the Children, the orphans' court expressed that:

> The record reflects that the Children are safe and stable and together in their current pre-adoptive home. While the orphans['] court is hopeful Mother can resolve her long-term substance abuse issues, among other things, upon her release from prison, whenever that may be, the Children deserve permanency. The Children's lives cannot be put on hold any longer in the hopes that Mother[] will be able to do what she had not been able to do in the past year, and quite frankly in the past seven … years, summon the ability to parent her Children.

> The record further reflects that K.A.M. had not seen Mother in over a year prior to the filing of the petition and B.G.M. had not seen Mother since shortly after her birth. The testimony and the

court[']s observations, in its capacity as juvenile court judge, revealed that the Children are thriving in their pre-adoptive home. Therefore, the termination of Mother's parental rights was in their best interest.

OCO at 14 (unnecessary capitalization omitted); *see also In the Interest of R.J.T.*, 990 A.2d 777, 788 (Pa. Super. 2010), *rev'd on other grounds*, 9 A.3d 1179 (Pa. 2010) (citation omitted) ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."). The orphans' court found B.G.M. "was removed at the time of birth, so there is no bond there and there has not been any visits since[,]" and K.A.M. "hasn't seen [Mother] in well over a year. He's bonded with his foster family." N.T. at 81-82. When making its ruling, the orphans' court also conveyed its belief that Mother behaved selfishly. *See id.* at 77-78 ("So to sit there and ask this [c]ourt for another chance at this point is … selfish because you had a chance."); *id.* at 78 ("[Mother was not] thinking about [K.A.M.] when [she] used drugs. [Mother was not] thinking about [K.A.M.] when [she was] on meth and putting the life of [an] unborn [B.G.M.] in danger."); *id.* ("No one looked at [the orphans' court] and said [K.A.M.] needs this. [It was ']I need this, I need this, I can do this, this is about me.['] It's not. This whole process is about [the Children].").

Upon review, it is clear the orphans' court prioritized the needs and welfare of the Children in making the determination to terminate Mother's parental rights. *See K.T.*, *supra*. As there is competent evidence in the record supporting the orphans' court's findings, we conclude the court did not

abuse its discretion in terminating Mother's parental rights under Section 2511(b).

Accordingly, we affirm the orphans' court's December 3, 2025 decrees involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/28/2026